*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0407**
**A25-0408**
**A25-0410**

State of Minnesota, by its Attorney General, Keith Ellison,
Respondent,

vs.

American Petroleum Institute,
Appellant (A25-0407), Defendant (A25-0408, A25-0410),

Exxon Mobil Corporation, et al.,
Appellants (A25-0408), Defendants (A25-0407, A25-0410),

Koch Industries, Inc., et al.,
Appellants (A25-0410), Defendants (A25-0407, A25-0408).

**Filed January 26, 2026**
**Affirmed**
**Larkin, Judge**

Ramsey County District Court
File No. 62-CV-20-3837

Keith Ellison, Attorney General, Oliver Larson, Assistant Attorney General, St. Paul, Minnesota; and

Peter N. Surdo, Special Assistant Attorney General, St. Paul, Minnesota (for respondent State of Minnesota)

Thomas H. Boyd, Eric F. Swanson, Winthrop & Weinstine, P.A., Minneapolis, Minnesota; and

Brian D. Schmalzbach (pro hac vice), McGuireWoods LLP, Richmond, Virginia (for appellant American Petroleum Institute)

Steven L. Schleicher, Stephanie M. Laws, Maslon LLP, Minneapolis, Minnesota; and

William T. Marks (pro hac vice), Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC (for appellants Exxon Mobil Corporation, et al.)

Todd A. Noteboom, Andrew W. Davis, Andrew P. Leiendecker, Stinson LLP, Minneapolis, Minnesota (for appellants Koch Industries, Inc., et al.)

Considered and decided by Reyes, Presiding Judge; Larkin, Judge; and Slieter, Judge.

## NONPRECEDENTIAL OPINION

**LARKIN**, Judge

In these consolidated appeals, appellants challenge the district court's denial of their motions to dismiss claims asserted by respondent State of Minnesota, which alleged that appellants engaged in a deceptive campaign to mislead Minnesota consumers and the public regarding climate change and fossil fuels. We affirm.

## FACTS

In June 2020, respondent State of Minnesota, by its Attorney General, Keith Ellison, commenced an action against appellants American Petroleum Institute (API), Exxon Mobil Corporation, et al. (Exxon), and Koch Industries, Inc., et al. (Koch) in district court. Appellants are various entities affiliated with the petroleum industry. The state alleges that appellants misled Minnesotans about the climate-change consequences of using fossil fuels. The state asserts five claims: (1) a violation of the prevention-of-consumer-fraud act, Minn. Stat. § 325F.69, subd. 1 (2024); (2) failure to warn—strict and negligent liability; (3) fraud and misrepresentation; (4) deceptive trade practices under Minn. Stat.

2

§ 325D.44, subd. 1 (2024); and (5) violation of the false-statement-in-advertising act, Minn. Stat. § 325F.67 (2024).

Appellants moved to dismiss the state's complaint on numerous grounds. The district court dismissed the state's prevention-of-consumer-fraud-act claim but otherwise denied appellants' motions to dismiss. As is pertinent here, the district court denied API's and Exxon's personal-jurisdiction challenges, denied API's and Exxon's claim that the state's actions violated the dormant-commerce clause, and denied API's and Koch's claims that the state's lawsuit is barred by Minnesota's anti-Strategic Lawsuit Against Public Participation (anti-SLAPP) statutes.

Appellants separately appealed the district court's rulings, and we consolidated the appeals.

**DECISION**

To state a claim for relief, a complaint need only "contain a short and plain statement of the claim showing that the pleader is entitled to relief." Minn. R. Civ. P. 8.01. "A claim is sufficient against a motion to dismiss for failure to state a claim if it is possible on any evidence which might be produced, consistent with the pleader's theory, to grant the relief demanded." *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 603 (Minn. 2014). In reviewing whether a complaint is sufficient to survive a motion to dismiss for failure to state a claim, we must "consider only the facts alleged in the complaint, accepting those facts as true" and "construe all reasonable inferences in favor of the nonmoving party." *Finn v. Alliance Bank*, 860 N.W.2d 638, 653 (Minn. 2015) (quotation omitted). We review a district court's

3

denial of a motion to dismiss for failure to state a claim de novo. *Larson v. Wasemiller*, 738 N.W.2d 300, 303 (Minn. 2007).

## I.

API and Exxon challenge the district court's exercise of personal jurisdiction. "Personal jurisdiction refers to a court's power to exercise control over the parties in a case." *Young v. Maciora*, 940 N.W.2d 509, 514 (Minn. App. 2020) (quotation omitted), *rev. denied* (Minn. May 19, 2020). "The requirement that a court have personal jurisdiction flows from the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Husky Constr., Inc. v. Gestion G. Thibault, Inc.*, 983 N.W.2d 101, 107 (Minn. App. 2022) (quotation omitted), *rev. denied* (Minn. Mar. 14, 2023).

"Once a defendant challenges personal jurisdiction, the burden of proof is on the plaintiff to show the jurisdiction exists." *C.H. Robinson Worldwide, Inc. v. FLS Transp., Inc.*, 772 N.W.2d 528, 533 (Minn. App. 2009), *rev. denied* (Minn. Nov. 24, 2009). "When multiple parties are named as defendants, personal jurisdiction must be established for each defendant." *Id.* "At the pretrial stage, a plaintiff need only make a prima facie showing of jurisdiction, and the complaint and supporting evidence will be taken as true." *Id.* "In doubtful cases, doubts should be resolved in favor of retention of jurisdiction." *Id.* at 534 (quotation omitted).

"Whether personal jurisdiction exists is a question of law, which [appellate courts] review de novo." *Bandemer v. Ford Motor Co.*, 931 N.W.2d 744, 749 (Minn. 2019) (quotation omitted). In doing so, we "take the factual allegations in the complaint as true, and view the facts in the light most favorable to the plaintiff." *State by Ellison v.*

4

*HavenBrook Homes, LLC*, 996 N.W.2d 12, 22 (Minn. App. 2023) (citation omitted), *rev. denied* (Minn. Jan. 16, 2024).

"One of the oldest tenets of personal jurisdiction is that a defendant may voluntarily submit to the jurisdiction of a court." *Rykoff-Sexton, Inc. v. Am. Appraisal Assocs., Inc.*, 469 N.W.2d 88, 89-90 (Minn. 1991). And it is an "[e]qually well-established . . . principle that a state may exact from the nonresident, as a condition of performing some activity in the state, consent to personal jurisdiction." *Id.* at 90. The district court determined that API and Exxon consented to personal jurisdiction in Minnesota by registering to do business under the Minnesota Foreign Corporation Act (MFCA), Minn. Stat. §§ 303.01-.24 (2024). API and Exxon challenge that determination. Because the district court correctly determined that it could exercise consent jurisdiction and that issue is dispositive, we limit our jurisdictional analysis to that issue.

The MFCA provides that "[n]o foreign corporation shall transact business in this state unless it holds a certificate of authority so to do." Minn. Stat. § 303.03. To procure a certificate of authority, foreign corporations must "irrevocably consent[] to the service of process." Minn. Stat. § 303.06(4). The MFCA further mandates that foreign corporations shall have a registered office and registered agent and shall be subject to service of process by service on its registered agent. Minn. Stat. §§ 303.10, .13. "After the issuance of a certificate of authority by the secretary of state . . . the corporation shall possess within this state the same rights and privileges that a domestic corporation would possess . . . and shall be subject to the laws of this state." Minn. Stat. § 303.09. The Minnesota Supreme Court has held that when a company irrevocably consents to service of process under the MFCA,

5

the corporation validly consents to personal jurisdiction. *Rykoff-Sexton, Inc.*, 469 N.W.2d at 90.

API contends that the district court's exercise of consent jurisdiction violates the Due Process Clause of the United States Constitution. API also contends, along with Exxon, that the MFCA violates the dormant Commerce Clause of the United States Constitution. We address each constitutional challenge in turn.

*Due Process*

API asserts that the district court's exercise of jurisdiction based on the MFCA violates its due process rights as guaranteed under the Fourteenth Amendment of the United States Constitution. Specifically, API argues that more recent United States Supreme Court precedents undermine the Minnesota Supreme Court's decision in *Rykoff-Sexton*. API relies on *Mallory v. Norfolk Southern Railway. Co.*, 600 U.S. 122 (2023), *Daimler AG v. Bauman*, 571 U.S. 117 (2014), and *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915 (2011).

After API filed its appellate brief, we squarely addressed the arguments that API makes in this case in a nonprecedential opinion. *See Lynn v. BNSF Ry. Co.*, No. A24-1449, 2025 WL 1860488, at *2-4 (Minn. App. July 7, 2025), *rev. denied* (Minn. Oct. 3, 2025). Nonprecedential opinions of this court are not binding, but they may be referenced for their persuasive reasoning. *See* Minn. R. Civ. App. P. 136.01, subd. 1(c) ("Nonprecedential opinions and order opinions are not binding authority except as law of the case, res judicata or collateral estoppel, but nonprecedential opinions may be cited as persuasive authority.").

6

*Lynn* is persuasive here, and for the reasons that follow, we reject API's jurisdictional argument based on our analysis in *Lynn*.

API argues that the district court erred because "*Rykoff-Sexton* was decided decades before the U.S. Supreme Court confirmed general jurisdiction's vastly 'reduced role' in modern jurisprudence." API first contends that, since *Rykoff-Sexton*, the Supreme Court "made clear in *Daimler* . . . and *Goodyear* . . . that 'all-purpose' jurisdiction is a limited concept not easily invoked." API thus argues that "*Rykoff-Sexton*'s pre-*Daimler* and *Goodyear* ruling," which authorized personal jurisdiction "simply by registering for a certificate of authority" under the MFCA is on "shaky ground."

But as we observed in *Lynn*, the Supreme Court in *Mallory* flatly rejected the argument that intervening decisions of the Court have implicitly overruled traditional consent jurisdiction precedent. *Lynn*, 2025 WL 1860488, at *4 (citing *Mallory*, 600 U.S. at 136). In rejecting that argument, the *Mallory* Court explained that in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), the Court had merely "stake[d] out an *additional* road to jurisdiction over out-of-state corporations." *Mallory*, 600 U.S. at 138. Under *International Shoe*, "an out-of-state corporation that *has not* consented to in-state suits may also be susceptible to claims in the forum State based on the quality and nature of its activity in the forum." *Id.* (quotation omitted). The Supreme Court further explained that precedents applying *International Shoe*—namely *Daimler* and *Goodyear*—"have long spoken of the decision as asking whether a state court may exercise jurisdiction over a corporate defendant that *has not consented* to suit in the forum." *Id.* (quotations omitted).

7

The *Mallory* Court observed that its precedents regarding express or implied consent "can continue to ground personal jurisdiction —and consent may be manifested in various ways by word or deed." *Id.* As such, the Court concluded that *International Shoe* "expanded upon the traditional grounds of personal jurisdiction" recognized in its prior consent jurisdiction precedent. *Id.* at 140-41. In sum, the Supreme Court rejected the suggestion that API makes here—that intervening decisions of the Court overruled its consent-jurisdiction precedent.

API next argues that in *Mallory*, the Supreme Court clarified "that *sometimes* a consent-by-registration framework can work" under the Due Process Clause. API argues that the *Mallory* Court "narrowly focused on Pennsylvania's registration statute which makes explicit that qualification as a foreign corporation shall permit state courts to exercise general personal jurisdiction over a registered foreign corporation." (Quotations omitted). According to API, "*Mallory* decided only that a statute like Pennsylvania's— which expressly informs foreign corporations of any personal jurisdiction consequences of registering to do business or designating an agent in the state—can reflect that corporation's consent to general personal jurisdiction." (Quotation omitted). Thus, API asserts that "[t]o fall within *Mallory*'s limited holding, . . . a State registration statute must look like Pennsylvania's" because "*Mallory* makes plain that 'express' or 'explicit' language describing registration's jurisdictional consequences is required" to comport with due process. API argues that the MFCA "looks nothing like Pennsylvania's" because it never uses the phrase "personal jurisdiction" or refers to "causes of action."

8

In *Lynn*, we determined that *Mallory* did not overrule *Rykoff-Sexton*. *Lynn*, 2025 WL 1860488, at *3. In doing so, we rejected the argument that, "unlike the statute in *Mallory*, section 303.06 does not explicitly say anything about personal jurisdiction, only service of process." *Id.* We explained that "the precedent relied upon in *Mallory* . . . applied a Missouri statute substantially similar to [Minnesota Statutes] section 303.06," which only obligated a foreign corporation to receive service of process in the state. *Id.* "And the United States Supreme Court determined that the exercise of personal jurisdiction under the Missouri statute did not violate due process because the corporation consented to suit in the forum when it consented to service of process." *Id.* Thus, we concluded that "it is immaterial that section 303.06 does not explicitly use the words 'personal jurisdiction.'" *Id.* In fact, the *Mallory* Court itself stated that none of its precedents regarding "consent to personal jurisdiction have ever imposed some sort of 'magic words' requirement." *Mallory*, 600 U.S. at 136, n.5.

In sum, the district court's exercise of personal jurisdiction based on the MFCA did not violate the Due Process Clause of the United States Constitution.

*Dormant Commerce Clause*

API and Exxon contend that an exercise of jurisdiction under the MFCA violates the dormant Commerce Clause of the United States Constitution. "The basic principle underlying the dormant Commerce Clause is that a state may not pursue economic isolation by placing burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Minn. Sands, LLC v. County of Winona*, 940 N.W.2d 183, 193 (Minn. 2020) (quotations omitted). "At the same time, the Supreme Court has

9

recognized that 'incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people.'" *Id.* (quoting *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978)).

"Modern precedents rest upon two primary principles that mark the boundaries of a State's authority to regulate interstate commerce." *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018). "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *Id.* A state law may not discriminate against interstate commerce on its face or on the basis of either discriminatory purpose or discriminatory effect. *Minn. Sands*, 940 N.W.2d at 193. A state law imposes undue burdens on interstate commerce if "a state law that regulates evenhandedly, and imposes only incidental burdens on interstate commerce," *Minn. Sands*, 940 N.W.2d at 194 (quotations omitted), is "clearly excessive in relation to the putative local benefits." *Wayfair*, 585 U.S. at 173.

On appeal, API and Exxon argue that the MFCA is both discriminatory *and* imposes an undue burden on interstate commerce. But in district court, they argued only that the MFCA discriminates against interstate commerce. We therefore limit our consideration of the Commerce Clause challenge to whether the MFCA is discriminatory. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (stating that appellate courts generally address only those questions previously presented to and considered by the district court); *see also Minn. Sands*, 940 N.W.2d at 199 n.15 (declining to consider the argument that the law at issue imposed an undue burden on interstate commerce where the argument was not raised

until reply brief). We first address API's argument that the MFCA is discriminatory in effect and next address Exxon's argument that the MFCA is facially discriminatory.

As to a statute's discriminatory effect, the Minnesota Supreme Court has explained that "the crucial inquiry is whether [a law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Minn. Sands*, 940 N.W.2d at 198 (quotations omitted). "For the [law at issue] to be considered as discriminatory in practical effect," a party "must demonstrate that the [law at issue] favors in-state economic interests over out-of-state interests." *Id.* (quotation omitted). However, "[n]egatively affecting interstate commerce is not the same as discriminating against interstate commerce." *Id.* (quotation omitted). Laws that have a discriminatory effect are unconstitutional "unless the government shows that it has no other means of advancing a legitimate, non-protectionist purpose." *Id.* at 197.

API argues that the "practical effect" of the MFCA is to disadvantage foreign corporations to the benefit of in-state corporations by "subject[ing] foreign corporations that register to do business in Minnesota to a burden that Minnesota companies do not face." Specifically, API argues that foreign corporations "must expose themselves to lawsuits on all claims—including those with no connection to Minnesota—to transact business in the State," while in-state corporations face no reciprocal burden for expanding operations into out-of-state markets. According to API, that is "discrimination, plain and simple."

11

In support of its argument, API cites a footnote in Justice Alito's concurrence in *Mallory*, and to *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888 (1988). In his *Mallory* concurrence, Justice Alito speculated that "[t]here is reason to believe that Pennsylvania's registration-based jurisdiction law discriminates against out-of-state companies" because a "state law discriminates against interstate commerce if its practical effect is to disadvantage out-of-state companies to the benefit of in-state competitors." *Mallory*, 600 U.S. at 161, 161 n.7 (Alito, J., concurring) (quotation omitted). Justice Alito stated that "Pennsylvania's law seems to discriminate against out-of-state companies by forcing them to increase their exposure to suits on all claims in order to access Pennsylvania's market while Pennsylvania companies generally face no reciprocal burden for expanding operations into another State." *Id.* n.7. But the *Mallory* Court did not consider whether the statute at issue violated the dormant Commerce Clause, and Justice Alito's concurrence does not represent the opinion of the court. *See Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997) (stating that a concurrence is not binding law and that dicta is not precedential).

When reviewing a constitutional challenge to a statute, we presume that the statute is constitutional, and we exercise our power to declare statutes unconstitutional "with extreme caution and only when absolutely necessary." *State v. Fitch*, 884 N.W.2d 367, 373 (Minn. 2016) (quotation omitted). The party challenging a statute's constitutionality "bears the very heavy burden" to demonstrate beyond a reasonable doubt that it is unconstitutional. *Id.* (quotation omitted). The suggestion in Justice Alito's concurrence

does not satisfy us—beyond a reasonable doubt—that the MFCA violates the dormant Commerce Clause.

API also relies on *Bendix*, in which the Supreme Court considered whether an Ohio statute that tolled the statute of limitations violated the Commerce Clause. 486 U.S. at 889. Although Ohio ordinarily recognized a four-year statute of limitations for contract and fraud claims, the challenged statute effectively tolled the statute of limitations indefinitely for claims against corporations that had not consented to service of process and thus general jurisdiction within Ohio. *Id.* The *Bendix* Court declined to consider whether the statue was discriminatory and considered only whether the statute imposed an undue burden on interstate commerce. *Id.* at 891. As to that issue, the Court reasoned that the undue burden arose because the statute imposed a greater burden on out-of-state companies by "subjecting the activities of foreign and domestic corporations to inconsistent regulations." *Id.* at 894. Thus, the challenged statute in *Bendix* is unlike the MFCA, which provides that "the corporation shall possess . . . the same rights and privileges that a domestic corporation would possess." Minn. Stat. § 303.09. Because the MFCA subjects in-state and out-of-state corporations to consistent laws in Minnesota, *Bendix* does not support API's argument that the MFCA has a discriminatory effect on interstate commerce.

As to the issue of facial discrimination, Exxon argues that the Minnesota Supreme Court's interpretation and application of the MFCA to establish personal jurisdiction violates the dormant Commerce Clause because it facially discriminates against foreign corporations.

13

"A law is facially discriminatory if it expressly provides for differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Minn*. *Sands*, 940 N.W.2d at 194 (quotation omitted). Laws that are facially discriminatory are "subject to a virtually *per se* rule of invalidity as a violation of Congress's exclusive right to make such regulations." *Id.* at 193 (quotation omitted). Accordingly, "[u]nless the state demonstrates that it has no other means to achieve a legitimate local purpose, the law is unconstitutional. *Id.* at 193-94. "The burden to establish discrimination rests on the party challenging the validity of the law." *Id.* at 193.

Exxon argues that the MFCA is facially discriminatory because section 303.03 "imposes a registration requirement" only on foreign corporations and because section 303.06, "as construed by the Minnesota Supreme Court in *Rykoff-Sexton*, requires only foreign corporations to submit to general jurisdiction as a condition of registration." Exxon further argues that these provisions, read together, "subject out-of-state corporations to general jurisdiction in Minnesota under circumstances in which an equivalent Minnesota corporation would not likewise be subject to general personal jurisdiction outside" of Minnesota. Exxon therefore asserts that the MFCA "serve[s] as a disincentive for out-of-state corporations to do business in Minnesota, because doing so will subject them to liability in a foreign and possibly inconvenient forum for *any* cause of action that could be brought against it, no matter where in the world it arose." According to Exxon, the MFCA insulates Minnesota businesses and "facially discriminate[s] against interstate commerce" because it "increas[es] exposure to legal liability for out of state companies alone."

14

In support of this argument, Exxon relies on *Healy v. Beer Institute* for the proposition that the Supreme Court has invalidated laws that seek to hoard commerce for the benefit of in-state corporations. 491 U.S. 324 (1989). In *Healy*, the Supreme Court concluded that a Connecticut statute was facially discriminatory because the statute, "[b]y its plain terms" applied "solely to interstate brewers or shippers of beer" and "[u]nder the statute, a manufacturer or shipper of beer [was] free to charge wholesalers within Connecticut whatever price it might choose so long as that manufacturer or shipper d[id] not sell its beer in a border State." *Id.* at 341. The Court reasoned that the "discriminatory treatment establishe[d] a substantial disincentive for companies doing business in Connecticut to engage in interstate commerce, essentially penalizing Connecticut brewers if they seek border-state markets and out-of-state shippers if they choose to sell both in Connecticut and in a border State." *Id.* The Court therefore concluded that the statute violated the dormant Commerce Clause. *Id.* at 340-41.

According to Exxon, the MFCA operates similarly to the statute in *Healy* by forcing out-of-state corporations to internalize "the costs of increased exposure to legal liability if they wish to do business in Minnesota" and that in-state corporations "typically do not face [such costs] when they expand to other jurisdictions." However, unlike the statute in *Healy*, the MFCA treats foreign corporations the same as in-state corporations. *See* Minn. Stat. § 303.09 (providing the same rights and privileges for in-state and out-of-state businesses). Furthermore, unlike the statue in *Healy*, the MFCA does not prohibit or penalize Minnesota corporations for their interstate business operations. In sum, the

15

MFCA is unlike the statute in *Healy*, and it does not facially discriminate against interstate commerce.

Exxon also argues that the Supreme Court has often considered the regulatory choices of other states in assessing the validity of a state law under the dormant Commerce Clause. In support of this proposition, Exxon relies on *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959) and *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429 (1978) to further support its assertion that the MFCA is facially discriminatory.

In *Bibb*, the Supreme Court concluded that an Illinois statute that required a specific type of safety equipment to be affixed to trucks and trailers travelling on state highways, although nondiscriminatory, imposed an undue burden on interstate commerce because the design was "out of line with the requirements of almost all the other States" and delayed and inconvenienced interstate motor carriers. 359 U.S. at 521-22, 528-30. In *Raymond*, the Supreme Court relied on *Bibb* and similarly concluded that a Wisconsin regulatory scheme which effectively prohibited the use of certain oversized vehicles on state highways imposed an undue burden on interstate commerce. *Raymond*, 434 U.S. at 432, 445-46. The Court in *Raymond* also reasoned, in part, that the regulatory scheme imposed an undue burden because it slowed the movement of goods in interstate commerce and prevented companies from accepting interline transfers of oversized vehicles that would move through Wisconsin even though the same vehicles were legal in thirty-three other states. *Id.* at 444.

According to Exxon, the MFCA essentially operates the same as the laws in *Bibb* and *Raymond* because the MFCA "require[s] out-of-state corporations to submit to general

16

jurisdiction as a condition of doing business in" Minnesota, and "[o]nly four other States impose such a requirement." Exxon argues that like the trucking companies in *Bibb* and *Raymond*—which "faced increased costs to travel through" Illinois and Wisconsin—"out-of-state corporations face increased costs to do business in Minnesota here." Exxon thus claims that the MFCA is discriminatory and warrants the strictest scrutiny.

But the Supreme Court in *Bibb* and *Raymond* held that the laws at issue imposed an undue burden on interstate commerce and thus violated the dormant Commerce Clause— not that the laws were facially discriminatory as Exxon argues to this court. *Bibb*, 359 U.S. at 529-30; *Raymond*, 434 U.S. at 444. Moreover, unlike the statutes at issue in *Bibb* and *Raymond*, which necessarily imposed additional costs on interstate carriers travelling through the states, the MFCA treats foreign corporations the same as in-state corporations. *See* Minn. Stat. § 303.09. Thus, we are not persuaded that the MFCA "expressly provides for differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Minn. Sands*, 940 N.W.2d at 194 (quotation omitted).

Again, "the crucial inquiry is whether the [law at issue] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Id.* at 198 (quotations omitted). The MFCA can be fairly viewed as a law directed to legitimate local concerns because Minnesota has a legitimate interest "in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985).

17

In sum, we are not persuaded—beyond a reasonable doubt—that the MFCA favors in-state economic interests over out-of-state interests or expressly provides for differential treatment of in-state and out-of-state economic interests. Thus, API and Exxon have not met their heavy burden to show that the district court's exercise of personal jurisdiction under the MFCA violates the dormant Commerce Clause.

## II.

API and Koch contend that the district court erred by denying their motions to dismiss under Minnesota's anti-SLAPP statutes, Minn. Stat. §§ 554.01-.06 (2022), which set forth a procedure "for citizens and organizations to seek dismissal of lawsuits that deter them from exercising their right to participate in government." *Leiendecker v. Asian Women United of Minn.*, 848 N.W.2d 224, 226 (Minn. 2014).

API's and Koch's arguments raise a statutory-interpretation issue, which we consider de novo. *Hagen v. Steven Scott Mgmt., Inc.*, 963 N.W.2d 164, 169 (Minn. 2021). In doing so, we try to "effectuate the intention of the legislature, reading the statute as a whole." *Id.* (quotation omitted). We look at the plain and ordinary meaning of a statute's words and phrases to see if the language is ambiguous, which means "subject to more than one reasonable interpretation." *Id.* (quotation omitted). If the language is unambiguous, we simply enforce it as written. *Id.*

The applicable anti-SLAPP statutes were repealed in 2024 and replaced with the Uniform Public Expression Protection Act. 2024 Minn. Laws ch. 123, art. 18, §§ 1-16, at 2412-16. However, the parties agree that the now-repealed anti-SLAPP statues apply in this case. Under those anti-SLAPP statutes, "[l]awful conduct or speech that is genuinely

18

aimed in whole or in part at procuring favorable government action is immune from liability, unless the conduct or speech constitutes a tort or a violation of a person's constitutional rights." Minn. Stat. § 554.03.

Procedurally, the anti-SLAPP statutes apply "to any motion in a judicial proceeding to dispose of a judicial claim on the grounds that the claim materially relates to an act of the moving party that involves public participation." Minn. Stat. § 554.02, subd. 1. The term "public participation" means "speech or lawful conduct that is genuinely aimed in whole or in part at procuring favorable government action." Minn. Stat. § 554.01, subd. 6.

When a party files an anti-SLAPP motion, "the responding party has the burden of proof, of going forward with the evidence, and of persuasion on the motion," and "the court shall grant the motion and dismiss the judicial claim unless the court finds that the responding party has produced clear and convincing evidence that the acts of the moving party are not immunized from liability under section 554.03." Minn. Stat. § 554.02, subd. 2(2)-(3). The term "responding party is defined as "any person against whom" an anti-SLAPP motion is filed. Minn. Stat. § 554.01, subd. 7.

The district court determined that the anti-SLAPP statutes do not apply to enforcement actions brought by the attorney general. In doing so, the district court relied on a rule-of-construction statute regarding sovereign immunity, Minn. Stat. § 645.27 (2024), which provides that "[t]he state is not bound by the passage of a law unless named therein, or unless the words of the act are so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature." The court reasoned that the anti-SLAPP statutes did not name the state or attorney general as a party against whom an anti-SLAPP

19

motion may be asserted. The district court next considered whether the anti-SLAPP statutes were "so plain, clear, and unmistakable as to leave no doubt as to the intention of the legislature" to permit use of the anti-SLAPP statutes against the state. *See* Minn. Stat. § 645.27. The district court analyzed the relevant terms "responding party" and "person" and concluded that the state was not encompassed by those terms.

The district court also relied on caselaw applying section 645.27 in circumstances in which a party sued the state for damages. *See Berrier v. Minn. State Patrol*, 9 N.W.3d 368, 370 (Minn. 2024) (determining that the state could be sued for an alleged violation of a dog-bite statute); *Nichols v. State*, 858 N.W.2d 773, 774 (Minn. 2015) (determining that the state could not be sued for alleged statutory tort violations); *Smallwood v. State, Dep't of Hum. Servs.*, 966 N.W.2d 257, 264-67 (Minn. App. 2021) (determining that the state could not be sued for an alleged violation of the Minnesota Health Records Act), *rev. denied* (Minn. Nov. 16, 2021). Unlike the circumstances in *Berrier*, *Nichols*, and *Smallwood*, API and Koch have not sued the state seeking damages. Instead, the state sued API and Koch, through its attorney general, in an enforcement action. For that reason, *Berrier*, *Nichols*, and *Smallwood* are inapposite.

On appeal, the state focuses on whether the state is a "responding party" as defined in the anti-SLAPP statutes. Section 554.01, subdivision 7, defines a "responding party" as "any person against whom a motion described in section 554.02, subdivision 1, is filed." In turn, section 554.02, subdivision 1, provides that the anti-SLAPP statute "applies to any motion in a judicial proceeding to dispose of a *judicial claim* on the grounds that the claim materially relates to an act of the moving party that involves public participation."

20

(Emphasis added.) The term "judicial claim" is defined as "any civil lawsuit, cause of action, claim, cross-claim, counterclaim, or other judicial pleading or filing seeking damages for an alleged injury." Minn. Stat. § 554.01, subd. 3. Under the plain language of the statutory scheme, there can be no "responding party" against whom to file a motion "to dispose of a judicial claim" unless there is in fact a "judicial claim." Thus, when determining whether the anti-SLAPP statutes may be utilized in a judicial proceeding, the first question is whether the proceeding involves a "judicial claim" as defined in the statute.

In answering that question, we again focus on the plain language of the statute and ask whether the state's lawsuit "seek[s] damages for an alleged injury." *Id.* The anti-SLAPP statutes do not expressly define the term "damages." However, caselaw distinguishes between legal damages and equitable remedies. "A court of equity, as a rule, declines the jurisdiction to grant mere compensatory damages when they are not given in addition to, or as an incident of, some other special equitable relief." *Leach v. Leach*, 209 N.W. 636, 638 (Minn. 1926). "While legal damages [for economic loss] may be awarded as an incident to an equitable action, courts generally decline to order legal damages unless they supplement the granting of equitable relief." *R.E.R. v. J.G.*, 552 N.W.2d 27, 30 (Minn. App. 1996).

In *R.E.R.*, the plaintiff sought damages for mental and emotional distress stemming from an alleged breach of fiduciary duty. *Id.* at 29-30. We stated that "actions for the breach of a fiduciary duty generally sound in equity." *Id.* at 30. We noted that the available equitable relief for such a claim includes the "recovery of the lost value of an asset, the profit of which a beneficiary was deprived, or any improper financial gains made by the

21

fiduciary." *Id.* We also noted that "[e]quity seeks to restore the plaintiff to the position he or she occupied before the breach or to claim the defendant's ill-gotten profits for the plaintiff." *Id.* We held that the *R.E.R.* plaintiff could "not recover damages for emotional distress and economic losses because the remedies he [sought were] not equitable in nature." *Id.* at 31. In short, "R.E.R.'s claimed damages [were] not appropriate remedies for his equitable claims." *Id.*

"Courts presume that the legislature acts with full knowledge of . . . existing caselaw." *Pecinovsky v. AMCO Ins. Co.*, 613 N.W.2d 804, 809 (Minn. App. 2000). "When a statute does not define a word, we assume the legislature is aware of its common-law meaning and intended to use the word according to that meaning." *State by Comm'r of Transp. v. Schneider*, 934 N.W.2d 140, 142 (Minn. App. 2019). Applying those principles here, we conclude that the word "damages" in the definition of "judicial claim" plainly refers to legal damages, and not equitable remedies, as distinguished in caselaw. Our conclusion is buttressed by additional language in the definition of a "judicial claim," which states that a "'[j]udicial claim' does not include a claim solely for injunctive relief." Minn. Stat. § 554.01, subd. 3.

The state's claims for relief consistently allege that appellants' violations of certain statutes caused the state and its citizens to "confer[] a benefit upon [appellants] by paying for the costs of the harms caused by [appellants'] improper and unlawful practices," that appellants "knowingly accepted and retained such benefits," and that appellants "have failed to pay for the consequences of their unlawful conduct." The state further alleges that as a result "of the conduct, practices, actions, and material omissions" described in its

22

complaint, appellants "obtained enrichment they would not otherwise have obtained," that "[t]he enrichment was without justification," and that the state "lacks an adequate remedy provided by law."

The state's claims for relief sound in equity, specifically, unjust enrichment. "Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Herlache v. Rucks*, 990 N.W.2d 443, 450 (Minn. 2023) (quotation omitted). A plaintiff claiming unjust-enrichment "must show that the defendant was enriched illegally or unlawfully, or in a manner that is morally wrong." *Id.* (quotation omitted). "The measure of relief for an unjust enrichment claim is based on what the person allegedly enriched has received, not on what the opposing party has lost." *Id.* (quotation omitted). However, "[e]quitable relief is available only upon a showing that no adequate legal remedy exists." *Stocke v. Berryman*, 632 N.W.2d 242, 245-46 (Minn. App. 2001), *rev. denied* (Minn. Sept. 25, 2001). As pleaded, the state's claims for relief are equitable, and its relief is limited accordingly. *See R.E.R.*, 552 N.W.2d at 31 (holding that plaintiff "may not recover damages for emotional distress and economic losses" because the "claimed damages are not appropriate remedies for his equitable claims").

As to its specific request for relief, the state requests judgment including the following forms of relief: "[e]njoin [appellants] . . . from engaging in conduct that violates [certain] Minnesota Statutes"; "[o]rder [appellants] to disclose, disseminate, and publish all research previously conducted directly or indirectly by themselves . . . that relates to the issue of climate change"; "[o]rder [appellants] to fund a corrective public education

23

campaign in Minnesota relating to the issue of climate change"; award "maximum civil penalties . . . for each separate violation of Minnesota law"; award "restitution pursuant to . . . the general equitable powers of this Court to remedy the great harm and injury to the State resulting from [appellants'] unlawful conduct"; and to "[o]rder ExxonMobil and Koch to disgorge all profits made as a result of their unlawful conduct."

Like its claims, the state's request for relief sounds in equity. The state does not ask for monetary legal damages. Instead, the state alleges that it "lacks an adequate remedy provided by law" and asks for "restitution pursuant to . . . [the court's] general equitable powers." And, the state's specific requests for relief are consistent with equitable relief. *See Herlache*, 990 N.W.2d at 450 ("The measure of relief for an unjust enrichment claim is based on what the person allegedly enriched has received, not on what the opposing party has lost.") (quotation omitted)).

In sum, the state's lawsuit seeks equitable remedies and not "damages" as that term is used in caselaw. Because respondent's lawsuit does not seek "damages for an alleged injury," it is not a "judicial claim" within the meaning of the anti-SLAPP statutes. *See* Minn. Stat. § 554.01, subd. 3 ("'Judicial claim' . . . includes any civil lawsuit . . . seeking damages for an alleged injury."). And because there is no "judicial claim," there can be no anti-SLAPP motion in the underlying judicial proceeding. *See* Minn. Stat. § 554.02, subd. 1 ("This section applies to any motion in a judicial proceeding *to dispose of a judicial claim* on the grounds that the claim materially relates to an act of the moving party that involves

public participation.") (emphasis added)). We therefore conclude that, by their plain language, the anti-SLAPP statutes do not apply against the state in this case.

**Affirmed.**